# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# GREENVILLE DIVISION

**TOMMY JACKSON**                                                                 **PLAINTIFF**

**v.**                                                                 **No. 4:07CV144-P-A**

**CHRISTOPHER EPPS, ET AL.**                                             **DEFENDANTS**

## REPORT AND RECOMMENDATION

On November 24, 2008, *pro se* prisoner plaintiff Tommy Jackson (# 32944), an inmate in the custody of the Mississippi Department of Corrections and housed in the East Mississippi Correctional Facility, appeared for an evidentiary hearing to determine the merits of his claim filed under 42 U.S.C. § 1983. This case is governed by the Prison Litigation Reform Act because the plaintiff was incarcerated when he filed this suit. *See* 28 U.S.C. § 1915(g).

Jackson claims that on January 11, 2006, while he was housed at the Mississippi State Penitentiary, defendant Corrections Officers Lawyer Ross and Randy Harper used excessive force against him during a search of his cell. Jackson also claims that Lieutenant Rebecca Blount observed the use of excessive force and failed to protect him. Finally, Jackson claims that the defendants placed him in the wrong housing classification – a misclassification that led to the use of excessive force against him. For the reasons set forth below, judgment should be entered for the defendants on these claims.

### Facts Established During the Evidentiary Hearing

Infection with the polio virus during childhood left Tommy Jackson with limited use of the muscles on the right side of his body. On January 11, 2006, Jackson was housed at Unit 29-G at the Mississippi State Penitentiary in Parchman. Field Operations Officers Lawyer Ross and Randy Harper entered the unit at about 10:20 a.m. and conducted a search of all the cells for contraband. When they approached Jackson's cell he became belligerent, yelling and cursing at

the officers. As part of the safety procedures for conducting such searches, Ross and Harper required Jackson and his cell mate, Marcus Carter, to exit the cell and sit down. Jackson exited the cell but refused to sit down. He continued to berate the officers. Ross entered Jackson's cell and began searching a locker inside. Jackson then slipped by Harper, entered the cell, and jerked Ross backwards by the collar, uttering obscenities and protesting the search of his cell. Harper then entered the cell and grabbed Jackson's lower body, while Ross grabbed him by the collar, and both forced Jackson onto his iron bunk. Jackson continued cursing and resisting, while Ross told Jackson that the officers would keep him pinned until he calmed down. After Jackson had calmed down somewhat, Ross and Harper released him, and he waited outside the cell, still cursing. Ross and Harper completed the search of the cell and found no contraband. Jackson and Marcus Carter reentered the cell, and Harper told Jackson to pack his belongings because he was going to lockdown. The last Ross and Harper saw of Jackson that day, he was standing in his cell, cursing them as they left at 10:30 a.m.

During this incident, Lieutenant Rebecca Blount was in her office interviewing an inmate. At 10:35 a.m., Officer Jessie Randle told her that Jackson had been standing at the bars of his cell but was now lying on the floor. Blount left her office, entered Jackson's cell, shook him, and asked if he was alright. At first Jackson would not speak, but then he said he was in pain "here," pointing to his ribs. Blount briefly examined Jackson and saw no signs of bruising on his face or back. Jackson told Blount that Officers Ross and Harper had attacked him. Blount went back to her office and at 10:48 a.m. called an ambulance to the scene, which arrived at 10:52 a.m. and took Jackson to the prison hospital at Unit 42.

Dr. James Burke, acting Medical Site Director at the Mississippi State Penitentiary, testified regarding Jackson's medical records. Jackson arrived at the prison hospital and complained of pain on his right side and left eye, as well as a headache. An emergency medical technician and a nurse examined Jackson – finding bruising just above his left eye and a hematoma on the right side of his forehead; Jackson again complained of a headache and pain in his ribs. The doctor's examination revealed bilateral bruises near Jackson's left and right eyes (with more bruising on the left side), a hematoma on his head, sore ribs, bruises on the right side of his chest, and Jackson complained of a headache. Jackson was treated with ice packs above his eyes and Tylenol for his soreness and swelling. He submitted a sick call request form complaining of soreness in his ribs on January 14, 2006 (three days after the incident), and was examined on January 17. By that time there was no discoloration and the soreness had improved. The January 17 entry was the last entry in Jackson's medical record regarding treatment for the injuries of January 11, 2006. Dr. Burke testified that Jackson's injuries were consistent with being forced onto an iron bunk as the two corrections officers had testified. Dr. Burke also testified that the injuries around Jackson's eyes were very localized – consistent with his eyeglasses being pushed hard or hit against his eyes – and not consistent someone beating Jackson's head and face with their fists.

Officers Ross and Harper issued two rule violation reports arising out of the incident – one for refusing to sit down when ordered to do so, and another for assaulting Officer Ross. Lieutenant Roach heard of the incident via phone from the Officer in Charge and, on the date of the incident, issued a Use of Force Report stating that the amount of force used was "physical by grabbing and wrestling [Jackson] onto his bed." On that day Roach also issued two Supervisor's Accident Reports describing the incident – one report from Ross' perspective and one from

Harper's. Officer Jessie Randle filled out an Incident Report on January 11, 2006 regarding Jackson's claim that he was assaulted by Ross and Harper. According to a Disciplinary Investigation Report, Jackson was interviewed two days later by Ed Carter. Jackson, who signed the report, stated that Ross initiated the physical confrontation. Carter submitted a second Disciplinary Investigation Report on January 23, 2006, summarizing Jackson's injuries and verifying that Ross had no injuries. A disciplinary committee found Jackson guilty of assaulting Officer Lawyer Ross. Jackson filed a grievance seeking to expunge the Rule Violation from his institutional record, but his grievance was denied. After Jackson completed the grievance procedure and filed the current case, the Mississippi Department of Corrections legal department requested an investigation conducted by Tara James, Internal Affairs Coordinator, Corrections Investigative Division ("CID"), MSP.

During the evidentiary hearing in this case, the court directed the defendants to produce any files regarding an investigation of the plaintiff's claims of excessive force arising out of the incident. The defendants have submitted the results of the investigation and an affidavit of Johnny Rogers, the current Director of CID. The affidavit states that no investigative file exists regarding Jackson or the incident giving rise to this case and that there were no allegations that excessive force was used against Jackson.[1] However, Jackson did tell medical personnel (as reported in the January 11, 2006, Emergency Record and the attached Progress Notes) that "he asked field operations officers [Ross and Harper] not to put his belongings on the floor and they jumped on him." In addition, Jackson stated in the January 12, 2006, Disciplinary Investigation

---

[1]The investigation report mentions that CO1 Melissa Stephens witnessed the encounter and submitted and incident report, which has not been made part of the record. According to the investigation report, however, Stephens' incident report corroborated the testimony of both Ross and Harper – as well as Jackson's statement in the disciplinary report that he was angry because the search left his belongings in disarray on the cell floor.

Report, "I got angry because Ofc. Harper was throwing my stuff around. I cursed him out. I didn't grab Ofc. Ross. Ofc. Ross grab[bed] me. I don't know who was hitting me in the face. I was the one who got assaulted." The disciplinary investigator also noted on January 23, 2006, that Jackson suffered a hematoma near his right eye and a bruise on the right side of his chest, and that Officer Ross suffered no injuries.

## Housing Classification

Jackson's claims regarding his housing classification should be dismissed. First, these claims were not mentioned during the grievance process and thus have not been exhausted. As such, they should be dismissed for failure to exhaust administrative remedies. 42 U.S.C. § 1997e(a); *Wright v. Hollingsworth*, 260 F.3d 357 (5th Cir. 2001). In addition, inmates have neither a protectable property or liberty interest to any particular housing assignment or custodial classification, either under the United States Constitution or under Mississippi law. *Hewitt v. Helms*, 450 U.S. 460, 468 (1983); *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995); *Wilson v. Budney*, 976 F.2d 957, 958 (5th Cir. 1992); *McCord v. Maggio*, 910 F.2d 1248, 1250 (5th Cir. 1990) (citations omitted); Miss. Code Ann. §§ 47-5-99 to -103 (1993). Prisoner classification is a matter squarely within the "broad discretion" of prison officials, "free from judicial intervention" except in extreme circumstances. *McCord*, 910 F.2d at 1250 (citations omitted). Jackson's medical condition is not an extreme circumstance warranting judicial intervention. For these reasons, Jackson's housing classification claim should be dismissed.

## Personal Involvement

Section 1983 plaintiffs may not rely upon a *respondeat superior* theory to support their claims. *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978). To state a claim

under § 1983, Jackson must "identify defendants who are either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged." *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995) (citing *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983)). In this case, the plaintiff does not allege that Superintendent Lawrence Kelly, Warden James Brewer, or Associate Warden Verlena Flagg had any personal involvement in the incident – or otherwise contributed to it. Superintendent Kelly and Warden Brewer were involved only during the grievance process, and Associate Warden Flagg was involved only in Jackson's classification – a claim recommended for dismissal above. Jackson's claims against these defendants should therefore be dismissed.

### Use of Excessive Force

Jackson's claim against Corrections Officers Ross and Harper is that they used excessive force against him during the search of his cell on January 11, 2006. A court must balance the constitutional rights of convicted prisoners with the needs of prison officials to effectively use force to maintain prison order. To establish liability of the defendants for excessive force, the plaintiff must prove the force was applied "maliciously and sadistically to cause harm," and not "in a good-faith effort to maintain or restore discipline . . . ." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)); *see Rankin v. Klevenhagen*, 5 F.3d 103 (5th Cir. 1993). A court must consider these factors when determining whether force used by prison guards is excessive: "(1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and, (5) any efforts made to temper the severity of the forceful response." *Rankin*, 5 F.3d at 107 n.5 (citation omitted). The court is not,

however, limited to these five factors. *Id.* "Not every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9 (citation omitted). "The Eighth Amendment's prohibition of 'cruel and unusual' punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* at 9-10 (citation omitted). Some injury is required to state a claim of excessive force under 42 U.S.C. § 1983. *Rankin*, 5 F.3d at 108; *see also Knight v. Caldwell*, 970 F.2d 1430 (5th Cir. 1992), *cert. denied*, 507 U.S. 926, 113 S. Ct. 1298, 122 L. Ed. 2d 688 (1993). A single incident of force or a single blow is *de minimis* and thus does not violate the Eighth Amendment. *Jackson v. Colbertson*, 984 F. 2d 699, 700 (5th 1993), *see, e.g., Siglar v. Hightower*, 112 F.3d 191, 193(5th Cir. 1997)(a sore, bruised ear lasting for three days is *de minimis* injury).

### First Factor: Extent and Origin of Jackson's Injuries

First, although it is a close call, Jackson's injuries rise above the *de minimis* threshold. He had bruised ribs, a hematoma on his head, and bruises near both eyes. His injuries were not, however, severe. After six days, these injuries improved to the point that Jackson no longer sought or required medical treatment for them, as the last entry in his medical file mentioning these injuries was January 17, 2006. Second, Jackson's injuries are more consistent with the testimony related by both Ross and Harper, and less with the testimony of Jackson himself. Jackson testified that Ross placed him in a headlock and dragged him into his cell while Harper punched him repeatedly in the head and face – and that in the scuffle one of the two officers kicked him in the ribs. Both Ross and Harper are large men. Had they beaten Jackson in the manner he described, then he would have sustained much more serious injuries than he did. Jackson's injuries, although more than *de minimis*, were minor, and thus weigh against

upholding his claims of excessive force.

### Second Factor: Need for the Application of Force

Jackson admitted that he was angry and agitated – and that he would not sit down as the officers had ordered. Jackson testified that he refused to sit down because, due to his disability, doing so would cause him pain – and perhaps injury. Both Ross and Harper testified, however, that Jackson was belligerent before they even reached his cell, that he refused to sit down when ordered, and that he entered the cell and assaulted Officer Ross. Harper testified that he frequently deals with disabled or injured inmates and often permits those inmates to stand during routine searches. Ross and Harper reacted to the security threat by forcing Jackson onto his bed and holding him there until he calmed down. Jackson struggled, fought back against the officers and sustained minor injuries during the struggle. This factor, too, weighs against Jackson's excessive force claim.

### Third Factor: Relationship Between the Need and the Amount of Force Used

Given Jackson's admittedly belligerent behavior, the need to restore order and discipline was clear, and the amount of force used was reasonable and appropriate for the need. This factor also weighs against Jackson's claim.

### Fourth Factor: Threat Perceived by the Prison Guards

Jackson moved past Officer Harper and jerked Officer Ross back by his collar. Harper testified that the Officers' fear in such a situation is justified because an inmate had previously attacked a guard from behind during just such a search and had stabbed the guard in the head. The officers were justified in perceiving Jackson as a legitimate threat to their safety – another factor weighing against Jackson's claim of excessive force.

### Fifth Factor: Efforts to Temper the Response

Despite Jackson's agitation, refusal to sit down, and security breach, Officers Ross and Harper simply manhandled him onto his bed and waited for him to calm down while he thrashed about and resisted. Once Jackson calmed down, the officers ensured that he waited outside the cell. They returned him to his cell when they concluded their search. The response of the officers was measured, tempered to fit the situation and thus weighs against Jackson's excessive force claim.

After considering these factors (each of which weighs against Jackson's excessive force claim), the court holds that Officers Ross and Harper applied force against Jackson in "a good-faith effort to maintain or restore discipline," rather than "maliciously and sadistically to cause harm." *Hudson* 503 U.S. at 6-7. For this reason, Jackson's claim against defendants Ross and Harper for use of excessive force should be dismissed and judgment entered for Ross and Harper.

**Failure to Protect**

Jackson claims that Lieutenant Rebecca Blount failed to protect him from attack by Officers Ross and Harper. First, as the court has found that neither Ross nor Harper used excessive force against Jackson, this claim fails on the merits. In addition, Lieutenant Blount testified that she was not in the guard tower when the altercation occurred; she was instead interviewing another inmate in a prison office. The court finds Blount's testimony to be credible. Both Blount and Jessie Randle submitted incident reports stating that Jessie Randle was the tower officer in Unit 29-G at the time of the incident. As Blount was not in the Unit 29-G tower at the time of the incident, Jackson's claim that she viewed the incident from the tower and should have stopped altercation or investigate is without merit. This claim should fail, as well.

In sum, the plaintiff Tommy Jackson's claims against the defendants are without merit, and the undersigned respectfully recommends that judgment be entered for the defendants in this case.

## Handling of Objections, Acknowledgment of Receipt

The court refers the parties to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b) for the appropriate procedure in the event any party desires to file objections to these findings and recommendations. Objections are required to be in writing and must be filed within fourteen (14) days of this date, and "a party's failure to file written objections to the findings, conclusions, and recommendation in a magistrate judge's report and recommendation within [14] days after being served with a copy shall bar that party, except on grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court . . . ." *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (*en banc*)(citations omitted); *see also United States v. Carrillo-Morales*, 27 F.3d 1054, 1061-62 (5th Cir. 1994), *cert. denied*, 513 U.S. 1178, 115 S.Ct. 1163, 130 L. Ed. 1119 (1995).

The plaintiff is directed to acknowledge receipt of this report and recommendation by signing the enclosed acknowledgment form and returning it to the clerk of the court within fourteen (14) days of this date. The plaintiff is warned that failure to comply with the requirements of this paragraph may lead to dismissal of this lawsuit under Fed. R. Civ. P. 41(b) for failure to prosecute the claim and for failure to comply with an order of the court.

Respectfully submitted this 10th day of March, 2010.

/s/  S. Allan Alexander
UNITED STATES MAGISTRATE JUDGE